**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
-------------------------------------------------------X
In re:                                       :          CHAPTER 11
                                             :
LATEX FOAM INTERNATIONAL, LLC.; :             CASE NO. 14-50845
PURELATEX BLISS, LLC.;                       :          CASE NO. 14-50846
LATEX FOAM INTERNATIONAL                     :          CASE NO. 14-50847
     HOLDINGS,  INC.;                        :
PLB HOLDINGS, LLC                            :          CASE NO. 14-50848
LATEX FOAM ASSETS                            :          CASE NO. 14-50849
     ACQUISITION, LLC                        :
                                             :          Jointly Administered under
                               Debtors       :          Case No. 14-50845
-------------------------------------------------------X
```

**DISCLOSURE STATEMENT RELATING**
**TO DEBTORS' JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

| | |
|---|---|
| COUNSEL TO DEBTORS AND | COUNSEL TO OFFICIAL COMMITTEE |
| DEBTORS-IN-POSSESSION | OF UNSECURED CREDITORS |
| James Berman, Esq. | Michael E. Baum, Esq. |
| Craig I. Lifland, Esq. | Brendan Best, Esq. |
| ZEISLER & ZEISLER, P.C. | SCHAFER AND WEINER |
| 10 Middle Street, 15th Floor | 40950 Woodward Ave., Ste. 100 |
| Bridgeport, CT 06604 | Bloomfield Hills, MI  48304 |

## I.   INTRODUCTION

Latex Foam International Holdings, Inc. ("LFIH" or "LFI Holdings"), Latex Foam International, LLC ("LFI"), PLB Holdings, LLC ("PLB Holdings"), Pure LatexBliss, LLC ("PLB") and Latex Foam Assets Acquisition, LLC ("Acquisition"), Debtors and Debtors-in-Possession, (collectively, "Debtors"), are soliciting acceptances of a chapter 11 joint plan of reorganization (the "Plan of Reorganization" or "Plan") attached as Exhibit 1 to this Disclosure Statement.  The Plan is jointly proposed with the Official Committee of Unsecured Creditors.  This solicitation is being conducted at this time to obtain sufficient votes to enable the Plan of Reorganization to be confirmed by the Bankruptcy Court.  Capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to such terms in the Plan.

WHO IS ENTITLED TO VOTE:  The Bank (Class 1),  DECD (Class 2), the holders of Allowed General Unsecured Claims (Class 3), and the holders of allowed Interests (Class 4) are entitled to vote on the Plan.  A ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of claims in these classes that are entitled to vote.

**THE DEBTORS  AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS RECOMMEND THAT CREDITORS IN CLASS 1, CLASS 2 AND CLASS 3  AND HOLDERS OF INTERESTS IN CLASS 4 VOTE TO ACCEPT THE PLAN.** The Debtors' legal advisor is Zeisler & Zeisler, PC.  They can be contacted at:

James Berman, Esq.
Craig I. Lifland, Esq.
ZEISLER & ZEISLER, PC
Attorneys for Debtors and
Debtors In Possession
10 Middle Street, 15th floor
Bridgeport, CT  06604
(203) 368-4234
jberman@zeislaw.com
clifland@zeislaw.com

The Official Committee of Unsecured Creditors' legal advisor is Schafer and Weiner.  They can be contacted at:

Michael E. Baum, Esq.
Brendan Best, Esq.
Schafer and Weiner
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI  48304
(248) 540-3340

The following table summarizes the treatment of Claims and Equity Interests under the Plan.  For a complete explanation, please refer to the discussion in section V below, entitled "THE PLAN OF REORGANIZATION" and to the Plan itself.

## II.  SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN[1]

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery |
|---|---|---|---|---|
| N/A | Administrative Expenses, Including 20 Day Claims | Except to the extent that a holder of an Allowed Administrative Expense agrees to less favorable treatment, the Reorganized Debtors shall  pay  in full in Cash on the later of the Effective Date, date due in the ordinary course, or if a Bankruptcy Court order is required when the order allowing the payment becomes final. | $ | 100% |
| N/A | Priority Tax Claims | Except to the extent that a holder of an Allowed Priority Tax Claim  agrees to less favorable treatment, the State's Priority Tax Claim, estimated at $104,156 for Sales and Use Tax, shall be paid in one of the following alternatives, at the option of the applicable Debtor: (i) paid in full on the Effective Date or (ii) as determined by the applicable Debtor over the statutory time period provided in section 1129(a)(9) plus interest | $104,156 | 100% |

---

[1] This table is only a summary of the classification and treatment of claims and equity interests under the Plan.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of claims and equity interests.

[2] The amounts set forth herein are the Debtors' estimates; the actual amounts will depend upon the final reconciliation and resolution of all Administrative Expenses and Claims. The Administrative Expenses include approximately $933,000.00 in 20 Day Claims. The General Unsecured Claims include the Claim of the DECD in the event the DECD rejects the Plan. The amount set forth herein of General Unsecured Claims will be further reduced by the 20 Day Claims.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery |
|---|---|---|---|---|
| | | calculated at the Interest Rate. | | |
| 1 | Secured Claim of Wells Fargo Bank, N.A. | Impaired; In payment of the Bank's Allowed Secured Claim, on the Effective Date, the Debtors shall execute and deliver to the Bank a replacement note that will provide, inter alia, that the Bank receive monthly principal and interest payments, amortized over thirty (30) years, for eighty-three (83) months following the Effective Date, and the remaining balance of principal and accrued but unpaid interest shall be due in full on the eighty-fourth (84th) month following the Effective Date.    The Bank's Allowed Secured Claim and replacement note shall bear interest from and after the Effective Date at the rate of interest equal to a U.S. Treasury Note with a seven (7) year term as of the day before the Confirmation Date plus 200 basis points, or such interest rate as otherwise determined by the Bankruptcy Court. | $16,408,344.64 | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery |
|-------|----------------------------------|-----------|-------------------------------|----------------------------------|
| 2 | Claim of DECD | Impaired;  In full and complete satisfaction of the DECD's Secured Claim (including the promissory note in the amount of Two Million Five Hundred Thousand ($2,500,000) Dollars plus any interest), the Debtors shall maintain their current employment and related obligations set forth in Section 2.17 of the DECD Agreement.<br><br>In the event the Debtors default in maintaining employment levels as provided above, then the DECD claim shall be reinstated solely to the extent provided in Section 2.17 of the DECD Agreement. | $2,500,000 | To be determined depending on vote |
| 3 | General Unsecured Claims | Impaired; The Holders of Allowed General Unsecured Claims shall receive Preferred Stock with a liquidation preference of 50% of the allowed claim amount in years 1-3 following the Effective Date which shall increase to 60% in year 4 and all times thereafter. | $12,753,307[3] | 50% if and when liquidation preference payment is made |

---

[3] This amount includes the claim of the DECD in the amount of $2,500,000.  If the DECD accepts the Debtors' Plan, the aggregate allowed unsecured claims shall be approximately $10,253,307, which amount shall be further reduced by the amount of 20 Day Claims.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery |
|-------|----------------------------------|-----------|-------------------------------|--------------------------------|
| 4 | Interests | Impaired; Equity Interests shall retain their interest subject certain restrictions in connection with the issuance of Preferred Stock  certain restrictions and dilution from a new management incentive plan. | N/A | N/A |

## A.      Summary of Voting Procedures

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for voting purposes.  If you hold claims in more than one class and you are entitled to vote claims in more than one class, you will receive separate ballots  that must be used for each separate class of claims.  Please vote and return your ballot(s) in accordance with the instructions set forth herein.

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE DEBTORS' VOTING AGENT, ZEISLER & ZEISLER, PC, **NO LATER THAN 4:00 P.M., PREVAILING EASTERN TIME, ON [_____], 2015 (THE "VOTING DEADLINE")**.  PLEASE RETURN YOUR PROPERLY COMPLETED BALLOT TO THE VOTING AGENT AT THE FOLLOWING ADDRESS:

ZEISLER & ZEISLER, PC
Attorneys for Debtors and
Debtors In Possession
10 Middle Street, 15th floor
Bridgeport, CT  06604
(203) 368-4234
Attn:   James Berman, Esq.
          Craig I. Lifland, Esq.

BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL **NOT** BE COUNTED.  FAXED COPIES OF BALLOTS WILL **NOT** BE COUNTED.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.  ANY PROPERLY

EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH
ACCEPTANCE AND REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE
TO ACCEPT THE PLAN. **BALLOTS SHOULD NOT BE DELIVERED
DIRECTLY TO THE DEBTORS, THE COURT OR THE COMMITTEE.**

If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot,
received a damaged ballot, or lost your ballot, or if you have any questions concerning
the procedures for voting on the Plan, please contact the Debtors' Voting Agent,
ZEISLER & ZEISLER, PC, Attorneys for Debtors and Debtors In Possession, Attn:
James Berman, Esq., Craig I. Lifland, Esq. 10 Middle Street, 15th floor, Bridgeport, CT
06604, (203) 368-4234.

SUMMARIES OF CERTAIN PROVISIONS OF DOCUMENTS
REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE
COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR
ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE
DOCUMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH
DOCUMENT.

    **1).**    **IF YOU HAVE THE FULL POWER TO VOTE ALLOWED
BANK CLAIM (CLASS 1):**

Please complete the information requested on the Ballot, sign, date, and
indicate your vote on the Ballot, and return your completed Ballot in the enclosed pre-
addressed envelope so that it is actually received by the Voting Agent before the Voting
Deadline.

    **2).**    **IF YOU HAVE THE FULL POWER TO VOTE THE DECD
ALLOWED CLAIM (CLASS 2):**

Please complete the information requested on the Ballot, sign, date, and
indicate your vote on the Ballot, and return your completed Ballot in the enclosed pre-
addressed envelope so that it is actually received by the Voting Agent before the Voting
Deadline.

    **3).**    **IF YOU HAVE THE FULL POWER TO VOTE ALLOWED
GENERAL UNSECURED CLAIMS (CLASS 3):**

Please complete the information requested on the Ballot, sign, date, and
indicate your vote on the Ballot and return your completed Ballot in the enclosed pre-
addressed envelope so that it is actually received by the Voting Agent before the Voting
Deadline.

    **4).**    **IF YOU HAVE THE FULL POWER TO VOTE ALLOWED
INTERESTS (CLASS 4):**

Please complete the information requested on the Ballot, sign, date, and indicate your vote on the Ballot and return your completed Ballot in the enclosed pre-addressed envelope so that it is actually received by the Voting Agent before the Voting Deadline.

Any voter that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline (as more fully described in section VII below, entitled "VOTING PROCEDURES AND REQUIREMENTS").

Any holder that has delivered a valid ballot may change its vote by delivering to the Voting Agent a properly completed subsequent ballot so as to be received before the Voting Deadline (as more fully described in section VII below, entitled "VOTING PROCEDURES AND REQUIREMENTS").

For detailed voting instructions, see the instructions on your ballot.  For a further discussion of voting on the Plan, see section VII below, entitled "VOTING PROCEDURES AND REQUIREMENTS."

**B.      Overview of Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and all economic parties in interest.  In addition to permitting rehabilitation of a debtor, chapter 11 promotes equality of treatment of similarly situated claims and similarly situated equity interests with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor of, or holder of an equity interest in, a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

In order to solicit acceptances of a proposed plan, however, section 1126 of the Bankruptcy Code requires a debtor and any other plan proponents to conduct such solicitation, pursuant to a disclosure statement containing adequate information of a kind,

and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  The Debtors are submitting this Disclosure Statement in accordance with the Disclosure Statement Order and the requirements of sections 1125 and 1126 of the Bankruptcy Code.

## III.

## DESCRIPTION OF THE BUSINESS

### A.    Description of Operating Businesses

Founded in 1975, the Debtor, Latex Foam International Holdings, Inc. is the world's largest manufacturer of latex mattresses and pillows, sold under many leading brand names through strategic business partners, and under its own brand, Pure LatexBLISS. Talalay Latex sleep products offer unsurpassed durability and levels of weightless comfort. More than 190 employees produce mattress cores, toppers and pillow buns utilizing both the Talalay and Dunlop manufacturing processes. The Debtors are headquartered in Shelton, Connecticut.

### B.    Prepetition Indebtedness

1.    <u>Senior Indebtedness</u>

Wells Fargo Bank, N.A. (the "Bank") provided financing to LFI in the original principal amount of $26,000,000 pursuant to the Original Loan Agreement (as defined below) entered into by the Bank, LFI and Latex International West Coast, Inc. ("<u>LIW</u>"). LIW was dissolved on December 30, 2011.    The loans advanced under the Loan Agreement are secured by substantially all assets of the Debtors.  The Debtor contends, among other things, that the
Bank's liens do not extend to the Debtors' insurance policies and certain proceeds therefrom, including without limitation, the Debtors' business interruption claim.

The remaining Debtors guaranteed all of LFI's obligations arising under the Loan Agreement.

The Bank, LFI and LIW (together, the "<u>Original Borrowers</u>"), are parties to that certain Amended and Restated Loan and Security Agreement dated April 17, 2006 (the "<u>Original Loan Agreement</u>"), as amended by those certain Master Reaffirmation and Amendments No. 1 through Master Reaffirmation and Amendments No. 14 (together with all exhibits, schedules, annexes, and as further amended and restated, collectively, the "<u>Pre-Petition Loan Agreement</u>").

In conjunction with the Original Loan Agreement, the guarantors, as applicable, executed the following guarantees whereby each guaranteed the obligations of the Original Borrowers under the Original Loan Agreement: (i) that certain Amended and Restated Continuing Guaranty Agreement dated April 17, 2006 by LFI Holdings in favor

of the Bank; (ii) that certain Continuing Guaranty Agreement dated September 28, 2008 by and between Acquisition and the Bank; (iii) that certain Continuing Guaranty Agreement dated May 7, 2010 by and between PLB Holdings and the Bank; and (iv) that certain Continuing Guaranty Agreement dated May 7, 2010 by and between PLB and the Bank (collectively, as each has been amended or reaffirmed from time to time, the "Guarantees").

As additional security for the obligations under the Original Loan Agreement and the Guarantees, the Debtors, as applicable, executed the following: (i) that certain Security Agreement dated September 28, 2008 by and between Acquisition and the Bank; (ii) that certain Security Agreement dated May 7, 2010 by and between PLB and the Bank; (iii) that certain Security Agreement dated May 7, 2010 by and between PLB Holdings and the Bank; (iv) that certain Security Agreement dated February 28, 2011 by and between LFI Holdings and the Bank; and (v) that certain Second Amended and Restated Stock and Membership Interest Pledge Agreement dated May 7, 2010 by and between LFI Holdings and the Bank (collectively, the "Security Agreements").

In addition to the Pre-Petition Loan Agreement, the Bank and Latex entered into that certain WellsOne® Commercial Card Program, dated on or about October 15, 2011 (the "WellsOne Card Program").

2.    Claim of DECD

The DECD holds a Secured Claim of $2,500,000 against LFI pursuant to a Promissory Note and related Assistance Agreement each dated July 23, 2012. Whether or not DECD's security interest is avoidable and/or its Secured Claim is subject to reduction pursuant to section 506 of the Bankruptcy Code has not yet been determined.

3.    Trade Debt

As of the Petition Date, and excluding in their entirety all disputed amounts, the Debtors also had outstanding trade payables, accrued expenses, and other general unsecured obligations of approximately $10,253,307, which includes approximately $933,000 of 20 Day Claims.

## III.

## KEY EVENTS LEADING TO THE
## COMMENCEMENT OF THE REORGANIZATION CASES

While other events may have contributed to the Debtors' bankruptcy, the most significant factor leading to the commencement of their chapter 11 cases was cash constraints, in part, caused by payments of approximately $10,000,000 in reduction of the Bank's debt in the three years prior to the filing and a sales process of the Debtors' business which caused a drop off in sales.

# IV.

## THE REORGANIZATION CASES

On May 30, 2014, LFI filed a voluntary petition for the relief afforded under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  In accordance with the provisions of 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code, the Debtors are authorized to continue to operate their businesses as a debtors-in-possession.  No trustee or examiner has been appointed in these proceedings.

A.      **Use of Cash Collateral**

To enable the continued operation of their business, avoid short-term liquidity concerns, and preserve the going concern value of their estates, the Debtors, together with their attorneys, negotiated the terms and conditions of a series of interim cash collateral orders with the Bank.

B.      **Creditors' Committee**

Pursuant to section 1102(a) and (b) of the Bankruptcy Code, on June 19, 2014, the U.S. Trustee appointed a  Committee to represent the interests of unsecured creditors in the Reorganization Cases. The current members of the Committee are:

| Creditors' Committee Members | |
|---|---|
| BASF CORPORATION<br>Attention: Peter Argiriou, Director of Credit<br>100 Park Avenue<br>Florham Park, NJ 07932<br>Telephone: 973.245.6577<br>Facsimile: 973.2245.6779 | INCENTIVE TEAM, LLC<br>Attention: Peter Goldberger, Senior Partner<br>2450 Atlanta Highway, Suite 1103<br>Cumming, GA 30040<br>Telephone: 770.643.4732<br>Facsimile: 404.382.6010 |
| RUCKEL MANUFACTURING CO.<br>Attention: Joseph Rottenberg, Partner<br>63 Flushing Avenue, Unit 331<br>Brooklyn, NY 11205<br>Telephone: 718.643.8005<br>Facsimile: 718.643.8008 | ERGOMOTION INC.<br>Michael Collins, Staff Accountant<br>19 East Ortega Street<br>Santa Barbara, CA 93101<br>Telephone: 805.979.3930<br>Facsimile: N/A |
| PLEASANT MATTRESS, INC.<br>Attention: Rion Morgenstern, Vice President<br>375 S. West Avenue<br>Fresno, CA 93706<br>Telephone: 559.268.6446<br>Facsimile: 559.268.0431 | |

C.      **Retention of Professionals.**  The Debtors have retained a series of professionals to assist with the reorganization process, including attorneys, accountants, an investment banker, and public adjuster.

D.      **Rejection of Burdensome Lease**.  As part of its reorganization efforts, the Debtors have rejected leases which have resulted in  an annual expense saving of approximately $627,000.

E.      **Bar Date.**

          In accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules, the Debtors requested and the Bankruptcy Court issued an order (the "Bar Date Order") establishing September 29, 2014 as the date by which proofs of claims (of parties other than governmental units) against the Debtors were to be filed in the Reorganization Cases (the "Bar Date").  A notice of the Bar Date was sent to all creditors as part of the Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, and Deadlines dated June 2, 2014.

F.      **The Fire.**

          On June 26, 2014, a major fire occurred at the Debtor's main facility in Shelton. Since the fire, the Debtors have resumed production and retained  a pubic adjuster to assist with insurance claims arising from the fire.  To Date, the Debtors have received approximately $7,103,161  mostly as reimbursement for losses/costs incurred and damage to inventory and equipment with  additional loss claims pending. In addition, the Debtors will have a business interruption claim.  The amount of  the business interruption claim has not yet been determined,

**V.**

**THE PLAN OF REORGANIZATION**

A.      **Introduction**

          The Plan provides for a restructuring of the Debtors' financial obligations which will result in a significant deleveraging of the Debtors.  The Debtors believe that the proposed restructuring will provide them with the necessary liquidity to compete effectively in today's business environment.

          The Debtors also believe, and will demonstrate to the Bankruptcy Court, that, under the Plan, creditors and shareholders will substantially more value than they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

          The following is a general discussion of the provisions of the Plan.  The Plan is attached as Exhibit 1 to this Disclosure Statement.  In the event of any discrepancies, the terms of the Plan will govern.

B.   **Classification and Treatment of Claims and Equity Interests Under the Plan of Reorganization**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below.  In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor.  Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects.  However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed.  These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement.  Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature.  Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan).  If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights.  Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are

13

actually due and payable, payment in full, in Cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable nonbankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced. Pursuant to 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan.  Accordingly, their votes are not solicited.  Under the Debtors' Plan, there is no class of claims which are unimpaired, and, therefore, there are no holders of claims who are "conclusively presumed" to have voted to accept the Plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization.   For a more detailed description of the requirements for confirmation, see section VIII.B below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION -- Requirements for Confirmation of the Plan of Reorganization."

Consistent with these requirements, the Plan divides the Allowed Claims against, and Allowed Equity Interests in, the Debtors into the following classes:

| Unclassified | Administrative Expenses | |
| Unclassified | Priority Tax Claims | |
| Class 1 | Secured Claims | Impaired |
| Class 2 | Claim of DECD | Impaired |
| Class 3 | General Unsecured Claims | Impaired |
| Class 4 | Equity Interests | Impaired |

1.    Unclassified

(a)    *Administrative Expenses*

Administrative Expenses are the actual and necessary costs and expenses of the Debtors' Reorganization Cases that are allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code.  Such expenses will include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the chapter 11 cases, tax obligations incurred after the Petition Date, and reclamation claims granted administrative expense status by the Debtors in accordance with the Bankruptcy Court order authorizing the implementation of certain reclamation procedures in these cases. Other administrative expenses include the actual, reasonable, and necessary professional fees and expenses of the Debtors' and Committee's advisors incurred during the pendency of the Reorganization Cases.

Administrative Expenses representing liabilities incurred by the Debtors in the ordinary course of business and consistent with past practice, or liabilities arising under loans or advances to the Debtors after the Petition Date, whether or not incurred in

the ordinary course of business, shall be assumed and will be paid by the Debtors in accordance with the terms and conditions of the particular transaction and any related agreements and instruments.  All other Allowed Administrative Expenses will be paid, in full, in Cash, on the Effective Date, or on such other terms to which the Debtors and the holder of such Administrative Expense agree.

All payments to professionals for compensation and reimbursement of expenses and all payments to reimburse expenses of members of any statutory committees will be made in accordance with the procedures established by the Bankruptcy Court and Bankruptcy Rules relating to the payment of interim and final compensation and expenses.

In addition to the foregoing, section 503(b) of the Bankruptcy Code provides for payment of compensation to creditors, indenture trustees, and other Persons making a "substantial contribution" to a chapter 11 case, and to attorneys for, and other professional advisors to, such Persons.  Requests for such compensation must be approved by the Bankruptcy Court after notice and a hearing at which the Debtors and other parties in interest may participate, and, if appropriate, object to such requests.

The Debtors estimate, assuming the Effective Date occurs no later than February 1, 2015, Allowed unpaid Administrative Expenses on the Effective Date will approximate $_____. [TO BE DETERMINED]

(b)        20 Day Claims

These Claims consist of claims entitled to priority under Section 503(b)(9) of the Bankruptcy Code.  They approximate $933,000.

(c)        *Priority Tax Claims*

Priority Tax Claims essentially consist of unsecured claims of federal and state governmental authorities for the kinds of taxes specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, excise taxes, and employment and withholding taxes.  These unsecured claims are given a statutory priority in right of payment.  The Debtors estimate that on the Effective Date, the Allowed amounts of such claims will aggregate approximately $104,156.

With respect to any Priority Tax Claims not paid pursuant to prior Bankruptcy Court order, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim will receive, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date, Cash in an amount equal to such Allowed Priority Tax Claim, or (ii) commencing on the Effective Date and continuing over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim, Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with simple interest at the Applicable Rate, subject to the sole option of the Debtors or Reorganized

Debtors to prepay the entire amount of the Allowed Priority Tax Claim without penalty. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date will be paid in the ordinary course of business as such obligations become due.

      2.    <u>Classified</u>

      The Plan provides for the treatment of each class of claims or interests as outlined below.

**Class I**:  Class I consists of the Allowed Secured Claim of the Bank.

      (a)    The Bank's Claim shall be Allowed in the amount of $16,408,344.64.

      (b)    In payment of the Bank's Allowed Secured Claim, on the Effective Date, the Debtors shall execute and deliver to the Bank a replacement Note that will provide, <u>inter</u> <u>alia</u>, that the Bank receive monthly principal and interest payments, amortized over thirty (30) years, for eighty-three (83) months following the Effective Date, and the remaining balance of principal and accrued but unpaid interest shall be due in full on the eighty-fourth (84th) month following the Effective Date.

      (c)    The Bank's Allowed Secured Claim and replacement note shall bear interest from and after the Effective Date at the rate of interest equal to a U.S. Treasury Note with a seven (7) year term as of the day before the Confirmation Date plus 200 basis points, or such interest rate as otherwise determined by the Bankruptcy Court.

      (d)    Collateral for the replacement note shall consist of all collateral that secured the Bank's claims as of the Petition Date, and supplemented by the collateral provided for in the Cash Collateral Orders, with such liens to have the same priority as existed on the Petition Date.

      (e)    The loan documents reflecting the treatment of the Bank Claim shall be included in the Plan Supplement, including, but not limited to, a new note and a new security agreement.   All pre-Effective Date Bank Loan Documents shall be extinguished on the Effective Date and be of no further force or effect.

      (f)    This Class is Impaired.

**Class II**.  Class II consists of the Secured Claim of the DECD, if and when Allowed.

(a)     The DECD's Secured Claim, is estimated to be equal to Two Million Five Hundred Thousand ($2,500,000.00) and 00/100 Dollars; however, the secured status is currently Disputed.

(b)     If the DECD votes in favor of the Plan, then:

(i)     In full and complete satisfaction of the DECD's Secured Claim (including the promissory note in the amount of Two Million Five Hundred Thousand ($2,500,000) Dollars plus any interest), the Debtors shall maintain their current employment and related obligations set forth in Section 2.17 of the DECD Agreement.

(ii)     In the event the Debtors default in maintaining employment levels as provided in Section 3.2 (b) (i) above, then the DECD claim shall be reinstated solely to the extent provided in Section 2.17 of the DECD Agreement.

(iii)     The Plan Supplement shall contain an amendment to the DECD Agreement providing for modifications described herein.

(c)     If the DECD votes to reject the Plan, then the DECD Secured Claim shall be Disallowed, the DECD Claim shall be an Allowed Class III Unsecured Claim, and the Debtors shall have no obligation to retain or employ any individuals in the State of Connecticut as of the Effective Date.

(d)     This Class is Impaired.

**Class III**.  Class III consists of the Holders of Allowed Unsecured Claims against the Debtors that have been scheduled in the amount of $12,753,307 [4], who shall receive, in full, complete and final satisfaction and release of their Allowed Unsecured Claims, the following:

(a)     The Class III claims shall be converted into the Preferred Stock of LFIH, to be issued on the Effective Date.

---

[4] This amount includes the claim of the DECD in the amount of $2,500,000.  If the DECD accepts the Debtors' Plan, the aggregate allowed unsecured claims shall be approximately $10,253,307, which amount shall be further reduced by the amount of 20 Day Claims.

17

(b)      On the Effective Date, the LFIH Trust shall be established for the benefit of Allowed Class III claims, with the corpus of the LFIH Trust to be the Preferred Stock of LFIH.  The LFIH Trust shall have one trustee, and the beneficiaries shall be the holders of Class III Allowed Claims.

(c)      <u>Attributes of Preferred Stock</u>.

(i)      The Preferred Stock shall have a liquidation preference equal to fifty (50%) percent of the aggregate face amount of all Allowed Unsecured Claims in years 1 through 3 following the Effective Date.  The liquidation preference shall increase to sixty (60%) percent commencing in year 4 and at all times thereafter.

(ii)      LFIH shall have the right to redeem the Preferred Stock for its liquidation preference at any time.

(iii)      The Preferred Stock shall not provide for any mandatory redemption or payment.

(iv)      Until the Preferred Stock is redeemed or otherwise ceases to be outstanding, the trustee of the LFIH Trust shall appoint one non-voting observer to attend meetings of the LFIH board of directors as an observer with customary information rights.  The Reorganized Debtors shall pay $20,000.00 to the LFIH Trust on the Effective Date and annually thereafter to cover the costs and fees associated with the LFIH Trust's non-voting observer.

(v)      The Common Stock shall not have any right to any dividends or other distributions of Reorganized Debtors' Net Income until the Preferred Stock has been redeemed or otherwise retired; provided that the foregoing shall not restrict the right of such entity to pay commercially reasonable employment compensation or otherwise do business with affiliates on commercially reasonable terms in the ordinary course of business (with pre-bankruptcy levels and agreements being deemed commercially reasonable and in the ordinary course of business).

(vi)      For as long as the Preferred Stock is outstanding, the LFIH Trustee shall have the right to review the books and records of the Reorganized Debtors  and shall receive timely interim pro forma quarterly financial statements within 45 days after the end of such quarter, and shall be provided reviewed or audited annual financial statements.

18

(vii)    The holders of Preferred Stock shall have voting rights pursuant to applicable Connecticut law solely with respect to certain fundamental actions (such as a change in control or liquidation) as more fully described in the Plan Supplement.

(viii)    The Plan Supplement shall contain all terms and provisions of the Preferred Stock.

(d)    The Debtors covenant to do business with holders of Allowed Unsecured Claims in Class III on commercially reasonable and customary market competitive trade and pricing terms during the 3 year period following the Effective Date.  Such trade terms shall take into consideration historical credit terms, pricing terms, and product values and discounts, allowances, rebates, product mix, alternative sources, and availability, and other applicable terms and provisions existing prior to the Petition Date that were most favorable to the Debtors in effect between the holder of an Allowed Class III claim and the Debtors prior to the Petition Date, or as otherwise agreed to by the Debtors and any such Class III creditor.

(e)    <u>Avoidance Actions</u>.  On the Effective Date, the Reorganized Debtors shall be deemed to have waived and released any Avoidance Action against holders of Allowed Class III claims.

(f)    This Class is impaired.

**Class IV.**  Class IV consists of the Interest holders in the Reorganized Debtors.

(a)    The holders of the Interests in the Debtors shall retain their Interests in each of the Reorganized Debtors as reorganized under the terms of this Plan except as their rights are altered by and pursuant to the issuance of the Preferred Stock to Allowed Unsecured Claims in Class III.

(b)    This class is impaired.

## C.    **Means of Implementing the Plan**

1.    **ASSUMPTION OF LIABILITY.**  The Reorganized Debtors shall be responsible for satisfying all of the Allowed Claims in accordance with the terms and provisions of the Plan.

2.    **SUBSTANTIVE CONSOLIDATION.**  Through this Plan, the Debtors are requesting substantive consolidation for voting and distribution purposes only. Notwithstanding the foregoing, each Reorganized Debtor shall retain its separate and independent corporate or company existence post Effective Date.

3.       **BOARD OF DIRECTORS AND MANAGEMENT INCENTIVE PLAN.**  On the
Effective Date, the Board of Directors of Reorganized LFIH shall consist of the following
individuals:  William C. Bassett, Gareth Clarke, Richard J. Coffey, David Fisher, Robert L.
Jenkins, Deann E. Murphy, and John L. Pouschine.  The non-voting observer appointed by
the LFIH Trust shall be James V. MeTevia.  In addition, LFIH shall establish an equity
incentive plan for its management and employees, which, when combined with existing
outstanding stock options, shall represent the right to purchase not less than 17.5% of the
fully-diluted common stock of LFIH, and shall make initial grants to management under
such plan promptly following the Confirmation Date which, when combined with existing
outstanding stock options, shall represent not less than 8.75% of the fully-diluted common
stock of LFIH.

4.       **PERMITTED REFINANCING**.  At any time on or after the Effective Date, the
Debtors, the Reorganized Debtors, or their successors or assigns, may pay the Holder of the
Class I Claim an amount equal to the lesser of (1) the total amount owed under the Class I
Claim, or (2) the value of the cash, inventory and receivables securing the Class I Claim (the
"Cash, Inventory and Receivables") as of the Petition Date which totals $6,363,000.
Notwithstanding anything in this Plan to the contrary, in accordance with section 552(a) of
the Bankruptcy Code, and without regard to any exceptions including any arguments based
on the "equities of the case" as set forth in section 552(b) of the Bankruptcy Code, property
acquired by the Debtors after the Petition Date are not subject to the Pre-Petition Liens
securing the Class I Claim, except to the extent of, and limited to, any interests granted in
the Cash Collateral Order.  Any Lien of the Holder of the Class I Claim on any cash,
inventory or receivables of the Reorganized Debtor shall be upon such payment released.
Any payment made pursuant to this Section shall not result in any diminution in the value of
any Pre-Petition Lien on any Collateral except Cash, Inventory and Receivables, after the
value of the payment is included in the calculation of the value of said Lien.

5.       **LFIH TRUST.**  On or before the Effective Date, the Trustee of the LFIH Trust and
the Debtors will execute the LFIH Trust.  Under no circumstances shall any of the Debtors'
or Reorganized Debtors' officers, directors, managing members, general partners or other
governing authorities be entitled to compensation from any of the Debtors, Reorganized
Debtors, or the LFIH Trust for services provided after the Effective Date relating to the
administration of the LFHI Trust.

6.       The Debtors are optimistic about their long-term economic prospects.  Since the
commencement of the Reorganization Cases, the Debtors have significantly reduced
general and administrative costs as well as other expenses.   Going forward, the Debtors
propose to continue to manage the operating businesses for stable long term growth, and
customer retention and acquisition.  In the opinion of the Debtors' management team,
continued successful execution of the their strategy combined with the restructuring
proposed in the Plan will enable the Debtors to continue to grow in the near and long
term for the benefit of all economic parties in interest in these Reorganization Cases.

1.      <u>Legal Form and Governance</u>

(a)      *New Organizational Documents*

The Debtors as may be specified in the Plan Supplement shall be deemed to have adopted any of their respective amended organizational documents effective as of the Effective Date.   On the Effective Date, or as soon thereafter as practicable, each such debtor shall file the applicable new organizational documents as required or deemed appropriate, with the appropriate Persons in the applicable jurisdiction of incorporation or organization.   Except to the extent amended or restated by applicable revised organizational documents, each Debtor's existing organizational documents will remain in full force and effect after the Effective Date.

(b)      *Boards of the Reorganized Debtors*

On the Effective Date, the operation of the Reorganized Debtors shall become the general responsibility of their respective Boards, subject to, and in accordance with, their respective amended organizational documents or existing organizational documents.  The initial members of the Boards of the Reorganized Debtors, together with biographical information are identified in Section     .

(c)      *Officers of the Reorganized Debtors*

The initial officers of the Reorganized Debtors, together with biographical information, shall be set forth in the Plan Supplement.

(d)      *Due Authorization*

On the Effective Date, the adoption of the amended organizational documents shall be authorized and approved in all respects, to be effective as of the Effective Date, in each case without further action under applicable law, regulation, order, or rule, including without limitation, any action by the directors, Boards, managers, members, partners or stockholders of the Debtors or the directors, Boards, managers, members, partners or stockholders of the Reorganized Debtors.  On the Effective Date, issuance of the Preferred Stock, and all other matters provided in the Plan involving the legal structure or governance of the Reorganized Debtors shall be deemed to have occurred, been authorized, and be in effect from and after the Effective Date, in each case without further action under applicable law, regulation, order, or rule, including, without limitation, any action by the directors, Boards, managers, members, partners or stockholders of the Debtors or the Reorganized Debtors.

D.      **Securities Law Matters - Exemptions from Registration**

In reliance upon section 1145 of the Bankruptcy Code, the offer and issuance of all notes and the Preferred Stock (to the extent that each constitutes "securities", and all notes, and the Preferred Stock being hereinafter collectively referred

to as the "1145 Securities") will be exempt from the registration requirements of the Securities Act of 1933 (the "Securities Act") and equivalent provisions in state securities laws.  Section 1145(a) of the Bankruptcy Code generally exempts from such registration requirements the issuance of securities if the following conditions are satisfied: (i) the securities are issued or sold under a chapter 11 plan by (A) a debtor, (B) one of its affiliates participating in a joint plan with the debtor, or (C) a successor to a debtor under the plan; and (ii) the securities are issued entirely in exchange for a claim against or interest in the debtor or such affiliate, or are issued principally in such exchange and partly for cash or property.  The Debtors believe that the exchange of 1145 Securities for Claims against the Debtors under the circumstances provided in the Plan will satisfy the requirements of section 1145(a) of the Bankruptcy Code.

The 1145 Securities will be "restricted securities" under applicable federal securities laws upon issuance on the Effective Date.  The Securities Act of 1933 (as amended, the "Securities Act") and the rules of the Securities and Exchange Commission (the "Commission") provide in substance that the holders may dispose of the 1145 Securities only pursuant to an effective registration statement under the Securities Act or an exemption therefrom.  However, the Debtors have no obligation or intention to register any of the 1145 Securities, or to take action so as to permit sales pursuant to the Securities Act (including Rule 144 thereunder).  Accordingly, under the Commission's rules, the holders may dispose of the 1145 Securities principally only in "private placements" which are exempt from registration under the Securities Act, in which event the transferee will acquire "restricted securities" subject to the same limitations as in the hands of the holders.  As a consequence, the holders must bear the economic risks of 1145 Securities for an indefinite period of time.  There is no public market for the 1145 Securities and such a public market may never develop.

Pursuant to the Plan, certificates evidencing 1145 Securities will bear a legend substantially in the form below:

**THE ISSUANCE OF THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND SUCH SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS SUCH OFFER, SALE OR TRANSFER IS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

The Debtors make no representations concerning the right of any person to transfer any securities to be distributed pursuant to the Plan.

E.    **Plan Provisions Governing Distribution**

    1.    <u>Date of Distributions</u>

    In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

    2.    <u>Distributions Concerning Disputed Class 3 Claims</u>

    (a)    *Disputed Claims Reserve*

    From and after the Effective Date, all Preferred Stock to be distributed on account of any Disputed Class 3 Claim when and if such Disputed Claims become Allowed, (a) will be maintained by the LFIH Trust Claim, and will be held in trust pending distribution by the LFIH Trust for the benefit of the holders of such Claims if Allowed.  To the extent that all Disputed Class 3 Claims are not Allowed in full, the amount of Preferred Stock reserved for such claim shall be refunded to LFI to the extent of any disallowance of said claims.

    (b)    *Amount of Reserve*

    The amount of Preferred Stock to be placed in Reserve shall be calculated as if each Disputed Claim were an Allowed Claim in its Face Amount, such that the Reserved Distribution shall include the aggregate Ratable Proportion of Preferred Stock that such Disputed Claims would receive if they were Allowed in their Face Amount.

    (c)    *Recourse*

    Each holder of a Disputed Class 3 Claim will have recourse only to the undistributed Preferred Stock held in the Disputed Class 3 Claim Reserve for satisfaction of the distributions to which holders of Disputed Class 3 Claims are entitled under the Plan, and not to the Reorganized Debtors, their property or any assets previously distributed on account of any Allowed Claim.

    3.    <u>Rights and Powers of Trustee for the LFIH Trust</u>

    (a)    *Powers of the Trustee*

    The Trustee will be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated to Class 3 holders of claims by the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Trustee by order of the Bankruptcy Court, pursuant to the Plan.

(b)        *Expenses Incurred on or After the Effective Date*

The Reorganized Debtors shall pay LFIH Trust $20,000 per year for administration purposes and shall not be responsible for any other cost of administration

4.      Delivery of Distributions

(a)        *Last Known Address*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim or interest by such holder that contains an address for such holder different from the address reflected for such holder on the Schedules.  In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent will use commercially reasonable efforts to determine the current address of such holder, but no distribution to such holder will be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution will be made to such holder without interest; provided that such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property will revert to Holdings, and the claim of any other holder to such property or interest in property will be discharged and forever barred.

(b)        *Distributions to Wells Fargo Bank, N.A.*

Distributions required under the Plan to holders of Allowed Secured Claims in Class 1 shall be made to the Bank, which, in turn, shall make the distributions to the holders of Allowed Secured Claims in accordance with the Prepetition Credit Agreement.

5.      Manner of Payment

At the option of the Reorganized Debtor, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

6.      No Fractional Distributions

No fractions of  Cash, shall be distributed from the LFIH Trust.  For purposes of distribution, all fractions of Cash shall be rounded up or down to the nearest whole number.

7.      Setoffs and Recoupment

The Debtors may, but will not be required to, set off against, or recoup from, any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any claim under the Plan will constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim it may have against such claimant.

8.      Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and accrued but unpaid interest thereon, such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

F.      **Procedures for Treating Disputed Claims**

1.      Objections

Except as otherwise provided in the Plan, as of the Effective Date, objections to, and requests for estimation of, Claims and Administrative Expenses may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of (a) sixty (60) days after the Effective Date, (b) sixty (60) days after a proof of Claim has been filed with Bankruptcy Court, (c) sixty (60) days after an application for allowance of an Administrative Expense has been filed with the Bankruptcy Court in the Reorganization Cases, or (d) with respect to certain Claims identified prior to the Confirmation Date by the Debtors, such other date as may be fixed by the Bankruptcy Court.

2.      No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, if any portion of a Claim or Administrative Expense is Disputed, no payment or distribution provided in the Plan shall be made on account of such Claim or Administrative Expense unless and until such Disputed Claim or Disputed Administrative Expense becomes Allowed.  In lieu of distributions under the Plan to holders of Disputed Class 3 Claims, if Allowed, the Disputed Class 3 Claim Reserve will be established on the Effective Date to hold Preferred Stock for the benefit of these Claim holders.

G.      **Treatment Of Executory Contracts**

EXECUTORY CONTRACTS. Unless addressed in Article III of this Plan or otherwise assumed or rejected by Final Order of the Bankruptcy Court, all executory contracts of

25

any Debtor which are either: (i) not expressly assumed, (ii) not the subject of a pending application to assumed as of thirty (30) after the Effective Date, or (iii) not insurance contracts provided in Section 11(A)(2) of the Plan, shall be deemed rejected. Within the time period set forth herein, the Reorganized Debtors shall be allowed to file a Notice of Assumption of Executory Contract (the "Assumption Notice") with the Bankruptcy Court and serve the Assumption Notice upon the affected party only. The executory contract which is the subject thereof shall thereupon be assumed subject to the provisions of this Article XI.

INSURANCE POLICIES. All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan and are hereby expressly assumed by the Debtors. Nothing contained herein shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including without limitation, the insurer under any of the Debtors' policies of insurance.

REJECTION OF DAMAGE CLAIMS. Any Creditor who has a Claim as a result of such rejection shall have thirty (30) days after the Effective Date to file a Proof of Claim, failing which such Claim shall be disallowed in its entirety. The solicitation of this Plan shall be sufficient informing any potential Creditor of this requirement.

OBJECTIONS TO REJECTION DAMAGE CLAIMS. The Reorganized Debtors may file an objection to any Proof of Claim filed in accordance with Section 11 (3) of the Plan on or before the later of (i) sixty (60) days after the filing of the Proof of Claim or (ii) the time set for the filing of objections in Section 12.1 of the Plan (including any extensions). The objection will be resolved in accordance with Article XII of the Plan.

ASSUMPTION OF UNEXPIRED LEASES. Subject to Section 11.6, below, upon the occurrence of the Effective Date, all unexpired leases shall be assumed, except for unexpired leases that are the subject of a motion to reject filed prior to or within thirty (30) days after the Effective Date. The Debtors or Reorganized Debtors may file one or more omnibus motions to reject unexpired leases prior to the Effective Date and no unexpired lease listed in such omnibus motion shall be assumed under this Section 11.5 of the Plan unless the lease is subsequently withdrawn by the Debtors or the motion to reject is denied as to such lease by a Final Order of the Bankruptcy Court.

ASSUMPTION AND CURE PAYMENTS. All assumed executory contracts and unexpired leases shall be Cured by the Reorganized Debtors pursuant to Section 11.7 of the Plan, unless other provisions have been agreed to by the counter-party. As long as the Reorganized Debtors comply with Section 11.7 of the Plan, all executory contract and unexpired lease counterparties must fulfill all contract and lease obligations and are enjoined from declaring a default for non-performance due to the bankruptcy or pre-assumption default.

RESOLUTION OF CURE CLAIM DISPUTES. For each executory contract or unexpired lease to be assumed under this Article Xl, within thirty (30) days after the Effective Date, the Debtors or Reorganized Debtors shall deliver a written proposal to the contract counter-party describing the method, timing and amount of any proposed Cure. The Reorganized Debtors'

proposal shall be binding unless the contract counter-party delivers to the Reorganized Debtors' counsel, within fifteen (15) days after receipt of the proposal, a written objection detailing all reasons for the counter-party's objection and setting forth a counter-proposal. In the event that the dispute cannot be resolved, either party may petition the Bankruptcy Court to resolve the dispute through filing of a properly noticed motion. In the event that the Bankruptcy Court sets a Cure amount greater than the Cure amount proposed by the Debtors, the Debtors shall have ten (10) Business Days to Cure or reject the contract or lease by filing a notice of rejection on the docket in this Case and sending notice thereof to the affected Creditor.

PRELIMINARY ASSUMPTION PENDING CHALLENGES. The assumption of a contract or lease under this Article does not prejudice the Debtors' or Reorganized Debtors' right to challenge whether any contract or lease is an executory contract or unexpired lease, as opposed to a disguised security agreement. If the Debtors or Reorganized Debtors challenges an assumed executory contract or unexpired lease, the Reorganized Debtors shall not be required to comply with the disputed portions of the executory contract or unexpired lease until a Final Order is entered resolving the dispute. If the dispute is not resolved in the Reorganized Debtors' favor, the Reorganized Debtors have the right to reject the executory contract or unexpired lease for a period of ten (10) days after entry of a Final Order by filing a notice of rejection on the docket in this Case and sending notice thereof to the affected Creditor.


H.      **Conditions Precedent to Effective Date**

1.      Conditions Precedent to Confirmation

The Plan will not be confirmed unless and until the following conditions have been satisfied or waived in accordance with Article IX of the Plan.  The Confirmation Order, in form and substance satisfactory to the Debtors and the Committee has been entered on the docket maintained by the Clerk of the Bankruptcy Court; and the Plan, all exhibits thereto, and the Confirmation Order are acceptable in form and substance to the Debtors and the Committee.

2.      Waiver of Conditions

Each of the conditions precedent in section 9.2 of the Plan, may be waived, in whole or in part, by the Debtors and the Committee.  Any such waivers may be affected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action.

I.      **Effect of Confirmation**

1.      Revesting of Assets

On the Effective Date, the Debtors, their properties and interests in property, and their operations will be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the Estates of the Debtors, including and pre-paid expenses or deposits with vendors, will vest in the Reorganized Debtors. From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, subject to the terms and conditions of the Plan.

2.      Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to distribution under the Plan.

3.      Discharge of Debtors

Except to the extent otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the treatment of all Claims against or Equity Interests in the Debtors thereunder shall be in exchange for and in complete satisfaction, discharge, and release of all debts of, Claims against, and Equity Interests in, the Debtors of any nature whatsoever, known or unknown, including, without limitation, any interest accrued or expenses incurred thereon from and after the Petition Date, or against their Estates, the Reorganized Debtors, or their properties or interests in property. Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective Date, all Claims against the Debtors will be satisfied, discharged and released in full in exchange for the consideration, if any, provided in the Plan. Except as otherwise provided in the Plan or in the Confirmation Order, all entities will be precluded from asserting against the Debtors or the Reorganized Debtors or their respective properties or interests in property, any other Claims based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

4.      Term of Injunctions or Stays

Except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims or Equity Interests will be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any of the Debtors or Reorganized Debtors, or their respective Affiliates or Representatives, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any Debtor or Reorganized Debtor, or their respective Affiliates or Representatives, with respect to such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against any Debtor or Reorganized Debtor, or their respective Affiliates or

Representatives, or against the property or interests in property of any Debtor or Reorganized Debtor, or their respective Affiliates or Representatives, with respect to such Claim or Equity Interest, and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to any Debtor or Reorganized Debtor, or their respective Affiliates or Representatives, or against the property or interests in property of any Debtor or Reorganized Debtor, with respect to such Claim or Equity Interests.

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

In furtherance of the foregoing, on and after the Effective Date, any "fifty percent shareholder" (within the meaning of section 382(g)(4)(D) of the Tax Code) will be enjoined from claiming a worthless stock deduction with respect to any Equity Interests held by such entity for any taxable year of such shareholder ending prior to the Effective Date.

5. <u>Indemnification Obligations</u>

Each Debtor's obligations under the Corporate Indemnities to indemnify any Indemnified Person with respect to Claims arising prior to the Effective Date will be deemed and treated as executory contracts that are assumed by the Reorganized Debtors pursuant to the Plan and sections 365 and 1123(b) of the Bankruptcy Code as of the Effective Date and the occurrence of the Effective Date shall be the only condition necessary to such assumption and all requirements for Cure and/or adequate assurance of future performance under section 365 for such assumption shall be deemed satisfied.

6. <u>Exculpation</u>

As of the Confirmation Date, the Debtors, their Affiliates and their Representatives shall be deemed to have solicited acceptances of the Plan of Reorganization in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.  The Debtors, the Reorganized Debtors, and the Committee and each of their respective Affiliates and Representatives shall have no liability to any holder of any Claim or Equity Interest or any other Person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Reorganization Cases, the Disclosure Statement, the Plan, the solicitation of votes for and the pursuit of confirmation of the Plan, the offer and issuance of any securities under the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as determined by a Final Order and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

7.      Causes of Action

(a)      *Avoidance Actions*

Effective as of the Effective Date, unless such avoidance or recovery cause of action is commenced prior to the Confirmation Date, all avoidance or recovery causes of action of the Debtors under sections 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code against the holders of Claims in Class 1, Class 2, Class 3 and Interests in Class 4 will be released and extinguished pursuant to the Plan.

**J.      Retention of Jurisdiction**

The Bankruptcy Court will have exclusive  jurisdiction of all matters, except as expressly noted herein, arising out of, or related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

a)   To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims and Administrative Expenses resulting therefrom;

b)   To determine any and all adversary proceedings, applications, and contested matters that are pending on the Effective Date;

c)   To ensure that distributions to holders of Allowed Administrative Expenses and Allowed Claims are accomplished as provided in the Plan;

d)   To hear and determine any timely objections to, or requests for estimation of, Administrative Expenses or proofs of claims, including, without limitation, any objections to the classification of any Administrative Expense, Claim or Equity Interest, and to allow or disallow any Disputed Administrative Expense or Disputed Claim, in whole or in part;

e)   To resolve disputes as to the ownership of any Administrative Expense, Claim, or Equity Interest;

f)   To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

g)   To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

h)   To consider any amendments to or modifications of the Plan, or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

i)   To hear and determine all applications of retained professionals under sections

30

330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

j) To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated by the Plan, any agreement, instrument, or other document governing or relating to any of the foregoing, or any settlement approved by the Bankruptcy Court;

k) To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date, or request by the Reorganized Debtors after the Effective Date, for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

l) To hear any other matter not inconsistent with the Bankruptcy Code;

m) To hear and determine all disputes involving the existence, scope and nature of the discharges, releases and injunctions granted under the Plan, the Confirmation Order, or the Bankruptcy Code;

n) To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any entity with the consummation or implementation of the Plan;

o) To enter a final decree closing the Reorganization Cases; and

p) To hear any claim, matter or chose in action, whether or not it has been commenced prior to the Effective Date, that any of the Debtors may prosecute, which has not been liquidated prior to the Effective Date, including, without limitation, any such matter for which the United States District Court for the District of Connecticut (the "District Court") may also have concurrent jurisdiction, in which case the District Court may also hear any such claim, matter or chose in action.

K.    **Miscellaneous Provisions**

1.    <u>Payment of Statutory Fees</u>

All fees payable under section 1930, chapter 123, title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on the Effective Date.

2.        Modification of Plan

The Plan may be modified by the Debtors and the Committee in accordance with section 1127 of the Bankruptcy Code.

3.        Revocation of Plan

The Debtors and the Committee reserve the right,  at any time prior to the entry of the Confirmation Order, to revoke and withdraw the Plan.

4.        Intercompany Claims

Notwithstanding anything to the contrary contained in the Plan of Reorganization, Intercompany Claims will be adjusted and discharged to the extent determined appropriate by the Debtors, taking into account the economic condition of the applicable Reorganized Debtor.

5.        Dissolution of the Committee

On date the Confirmation Order becomes a Final Order, the Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Reorganization Cases, and the retention or employment of the Committee's attorneys, accountants, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

6.        Severability of Plan Provisions

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

7.        Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise

(in which case the governing law specified therein will be applicable to such exhibit), the rights, duties, and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of Connecticut without giving effect to the principles of conflict of laws.

8.    Compliance with Tax Requirements

In connection with the consummation of the Plan, any party issuing any instrument or making any distribution under the Plan, including any party described in section 6.2 of the Plan, is to comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

9.    Expedited Tax Determination

The Debtors and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Petition Date through, and including, the Effective Date.

## VI.

## CERTAIN FACTORS AFFECTING THE DEBTORS

A.    **Certain Bankruptcy Law Considerations**

1.    Risk of Non-Confirmation of the Plan of Reorganization

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

2.    Non-Consensual Confirmation

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at

the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  See section VIII.B.1 below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION -- Requirements for Confirmation of the Plan of Reorganization – Requirements of Section 1129(b) of the Bankruptcy Code."  The Debtors believe that the Plan satisfies these requirements, however, there can be no guarantee that the Bankruptcy Court will make such a finding.

        3.      <u>Risk of Non-Occurrence of the Effective Date</u>

      Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

**B.**      **Additional Factors To Be Considered**

        1.      <u>The Debtors Have No Duty to Update</u>

      The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

        2.      <u>No Representations Outside This Disclosure Statement Are Authorized</u>

      No representations concerning or related to the Debtors, the Reorganization Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance, or rejection, of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

        3.      <u>Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary</u>

      Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various classes that might be allowed.

4.      <u>No Legal or Tax Advice is Provided to You by this Disclosure Statement</u>

The contents of this Disclosure Statement should <u>not</u> be construed as legal, business or tax advice.  Each creditor or Equity Interest holder should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is <u>not</u> legal advice to you.  This Disclosure Statement may <u>not</u> be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5.      <u>No Admission Made</u>

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Equity Interests.

6.      <u>Business Factors and Competitive Conditions</u>

a.  *General Economic Conditions*

The Debtors have assumed that the general economic conditions of the United States economy will be stable over the next several years.  The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors.  Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors.  There is no guarantee that economic conditions will improve in the near term.

b.  *Business Factors*

The Debtors believe that they will succeed in implementing and executing their business plan and operational restructuring for benefit of all constituencies.  However, there are risks that the goals of the Debtors' going-forward business plan and operational restructuring strategy will not be achieved.  In such event, the Debtors may be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings.

c.  *Competitive Conditions*

In addition to uncertain economic and business conditions, the Reorganized Debtors will likely face competitive pressures and other third party actions, including pressures from pricing and other promotional activities of competitors as well as new competition. The Reorganized Debtors' anticipated operating performance will be impacted by these and other unpredictable activities by competitors.

d.  *Customers*

35

The Debtors believe that the majority of their customer relationships are strong.  However, if the Debtors' customers delay or stop paying the Debtors for goods purchased or services rendered, assert unauthorized or inappropriate deductions  against payments due to the Debtors, or refuse to continue to do business with the Debtors on customary, ordinary course, or continuing terms, the Debtors' businesses may be harmed.  Additionally, the loss of a significant customer(s) could have a material adverse impact on operating performance.

> e.   *Other Factors*

Other factors that holders of Claims should consider are potential regulatory and legal developments that may impact the Reorganized Debtors.  Although these and other such factors are beyond the Debtors' control and cannot be determined in advance, they could have a significant impact on the Reorganized Debtors' operating performance.

f.   LFI's landlord at 510 River Road, Shelton, Connecticut claims to have terminated its lease with the LFI prior to the Petition Date.  LFI disputes that contention. If the dispute is not resolved consensually the Reorganized Debtors will seek a determination that the lease may be assumed over the landlord's objection.

> 7.    Access to Financing and Trade Terms

The Debtors' operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage or increased cost of such financing and trade vendor support.  The Debtors' postpetition operations have been financed from operating cash flow and insurance proceeds with respect to the June 2014 fire.  The Debtors believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Effective Date working capital financing will be met by projected operating cash flow and trade terms supplied by vendors.  However, if the Reorganized Debtors require working capital and trade financing greater than that provided by such sources, they may be required either to (a) obtain other sources of financing or (b) curtail their operations.  No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favorable or acceptable to the Reorganized Debtors.

> 8.    Lack of Trading Market

It is not contemplated that the 1145 Securities will be registered under the Securities Act or the Securities Exchange Act of 1934 as of the Effective Date nor is it contemplated that the 1145 Securities will be listed on a national securities exchange or the NASDAQ market system.  Accordingly, it is not contemplated that there will be any trading market for such 1145 Securities and there can be no assurance that a holder of any of the 1145 Securities will be able to sell such interests in the future or as to the price at which any such sale may occur.

9.      Restrictions on Transfer

Holders of 1145 Securities issued under the Plan will be unable freely to transfer or to sell their securities except pursuant to (i)  an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws or (ii) pursuant to an available exemption from registration requirements.  For a more detailed description of these matters, see section VI.D, above, entitled "THE PLAN OF REORGANIZATION – Securities Law Matters – Exemptions from Registration." However, the 1145 Securities issued under the Plan will be held by the LFIH Trust, and will not be distributed to individual holders of Class 3 Claims under the Plan.

C.      **Certain Tax Matters**

For a summary of certain federal income tax consequences of the Plan to holders of claims and equity interests and to the Debtors, see section XI below, entitled "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN."

**VII.**

**VOTING PROCEDURES AND REQUIREMENTS**

A.      **Voting Deadline**

IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASS 1 (THE BANK), CLASS 2 (DECD), CLASS 3 (UNSECURED CLAIMS) AND CLASS 4 (INTERESTS)  TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION.  All known holders of Allowed  Claims, and Interests entitled to vote on the Plan have been sent a ballot together with this Disclosure Statement.  Such holders should read the ballot carefully and follow the instructions contained therein.  Please use only the ballot that accompanies this Disclosure Statement.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 4:00 P.M., EASTERN TIME, ON _____, 2015**.

**IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE DEBTORS' VOTING AGENT AT THE NUMBER SET FORTH BELOW.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.**

37

**FAXED COPIES OF BALLOTS WILL NOT BE ACCEPTED.**

**IF YOU HAVE ANY QUESTIONS CONCERNING VOTING
PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:**

> ZEISLER & ZEISLER P.C.
> 10 Middle Street, 15th floor
> Bridgeport, CT  06604
> Attn:   James Berman
>             Craig I. Lifland
> (203) 368-4234

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the address set forth immediately above.

**B.      Holders of Claims Entitled to Vote**

Class 1 (Wells Fargo), Class 2 (DECD), Class 3 (General Unsecured Claims) and Class 4 (Interests) are impaired and entitled to vote to accept or reject the Plan.

**C.      Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims occurs when holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims of that class that cast ballots for acceptance or rejection of the plan of reorganization vote to accept the plan.  Thus, acceptance of the Plan by Class 1 (Wells Fargo), Class 2 (DECD) and Class 3 (General Unsecured Claims) will occur only if at least two-thirds in dollar amount and a majority in number of the holders of the Claims in the respective class that cast their ballots vote in favor of acceptance.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

D.    **Voting Procedures**

1.      Holders of Class 1 Claims (Wells Fargo)

All holders of Allowed Secured Claims as of the Record Date should complete the enclosed ballot.  To be counted, properly executed ballots must be returned to the Voting Agent so that they are received by the Voting Agent before the Voting Deadline.

2.      Holders of Class 2 Claims (DECD)

All holders of Allowed Other Secured Claims as of the Record Date should complete the enclosed ballot.  To be counted, properly executed ballots must be returned to the Voting Agent so that they are received by the Voting Agent before the Voting Deadline.

3.      Holders of Class 3 (General Unsecured Claims)

All holders of Allowed General Unsecured Claims as of the Record Date should complete the enclosed ballot.  To be counted, properly executed ballots must be returned to the Voting Agent so that they are received by the Voting Agent before the Voting Deadline.

4.      Holders of Class 4 (Interests)

All holders of Equity Interests as of the Record Date should complete the enclosed ballot.  To be counted, properly executed ballots must be returned to the Voting Agent so that they are received by the Voting Agent before the Voting Deadline.

5.      Withdrawal of Ballot

Any voter that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline. To be valid, the notice of withdrawal must (a) be signed by the party that signed the Ballot to be revoked and (b) be received by the Voting Agent before the Voting Deadline. The Debtors may contest the validity of any withdrawals.

Any holder that has delivered a valid ballot may change its vote by delivering to the Voting Agent a properly completed subsequent ballot so as to be received before the Voting Deadline.  In the case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted.

# VIII.

## CONFIRMATION OF THE PLAN OF REORGANIZATION

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the confirmation hearing for [_____, 2015].  The confirmation hearing may be adjourned from time-to-time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of claims or interests held or asserted by the objector against the Debtors' estate or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon (i) Zeisler & Zeisler P.C.,10 Middle Street, 15th floor, Bridgeport, CT 06604, Attorneys for the Debtors (Attention:  James Berman, Esq. or Craig I. Lifland, Esq.), (ii)Schafer & Weiner, Attorneys for the Committee (Attn: Michael Baum or Brendan Best_____), and (iii) Office of the United States Trustee, District of Connecticut, 150 Court StreetStreet, Suite 302New Haven, CT 06510 so as to be received no later than 4:00 p.m. (Eastern Time) on [_____, 2015.]

Objections to confirmation of the Plan of Reorganization are governed by Bankruptcy Rule 9014.  **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### B.    Requirements for Confirmation of the Plan of Reorganization

1.    <u>Requirements of Section 1129(a) of the Bankruptcy Code</u>

(a)    *General Requirements*

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1) The Plan complies with the applicable provisions of the Bankruptcy Code.

2) The Debtors have complied with the applicable provisions of the Bankruptcy Code.

40

3) The Plan has been proposed in good faith and not by any means proscribed by law.

4) Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Reorganization Cases, or in connection with the Plan and incident to the Reorganization Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5) The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan of Reorganization, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.  With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

6) Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

7) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred Cash payments, over a period not exceeding six years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

8) At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

9) Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.

      (b)              *Best Interests Test*

          As described above, the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

          The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case.  The next step, is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below).  Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

          The Bank's claim would likely exceed the value of the Debtors' assets in a chapter 7 liquidation.  Assuming, for the sake of argument, any assets were available for the Bank's claim, the Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed.  Additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the chapter 11 cases.

          The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims.  Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest.  The Debtors believe that in a chapter 7 case, holders of unsecured claims would receive no distributions of property.  Accordingly, the Plan satisfies the rule of absolute priority.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of the Debtors. The analysis is based upon a number of significant assumptions which are described. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

(c)           *Liquidation Analysis*

As of the Petition Date, the Bank was owed in excess of $16,000,000. The Debtors believe  that the Bank's claim would consume all assets of the Debtors except with respect to the Debtors' business interruption and related claim. The Bank, however, claims that its security interest extends to said claim and or it is entitled to the proceeds as a loss payee. At this time the Debtors' business interruption claim has not been made and attributing an amount to the claim in liquidation would be speculative both because the amount and whether or not it is an unencumbered asset is not yet known.

(d)           *Feasibility*

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder. Based upon their analysis, the Debtors believe they will be able to make all payments required to be made pursuant to the Plan and that they will need no further financial reorganization.

2.      Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

43

(a)        *No Unfair Discrimination*

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

(b)        *Fair and Equitable Test*

This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class.

(c)        *Secured Claims*

Each holder of an impaired secured claim either (i) retains its liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred Cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

(d)        *Unsecured Claims*

Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

(e)        *Equity Interests*

Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

# IX.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

### A.      Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  In a chapter 7 liquidation, the Debtors believe that there would likely be no distribution to the holders of Administrative Claims, General Unsecured Claims, or the holders of Equity Interests unless it was determined that the Debtors' business interruption claims were unencumbered by the Bank's lien.

A discussion of the effects that a chapter 7 liquidation would have on the recovery of holders of claims and equity interests and the Debtors' liquidation analysis are set forth in section VIII.B.1(b) above, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION -- Requirements for Confirmation of the Plan of Reorganization -- Requirements of Section 1129(a) of the Bankruptcy Code -- Best Interests Test."  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan – and likely no distributions to any creditors other than the secured creditors – because of (a) the loss of any all going concern value (since the Debtors could not continue to operate), (b) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (c) additional administrative expenses involved in the appointment of a trustee and (d) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

### B.      Alternative Plan of Reorganization

If the Plan of Reorganization is not confirmed, the Debtors or any other party in interest could attempt to formulate a different chapter 11 plan of reorganization. Such a plan of reorganization might involve either a reorganization or continuation of the Debtors' business or an orderly liquidation of its assets. The Debtors believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances.   Although preferable to a chapter 7 liquidation, the Debtors believe that any alternative liquidation under chapter 11 is a much less attractive

alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

## X.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to the holders of Class 3 Claims.  The following summary does not address the U.S. federal income tax consequences to holders whose Claims are unimpaired or otherwise entitled to payment in full in Cash under the Plan (*e.g.*, Administrative Expense Claims, Priority Non-Tax Claims, and certain Secured Claims).

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, persons not holding their Claims  as capital assets, financial institutions, tax-exempt organizations, persons holding Claims who are not the original holders of those Claims or who acquired such Claims at an acquisition premium, and persons who have claimed a bad debt deduction in respect of any Claims).

*Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.*

*IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, holders of Claims and Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.*

A.      **Consequences to Holders of Class 3 Claims**

Pursuant to the Plan, the holders of Allowed General Unsecured Claims (Class 3) will receive LFIH Preferred Stock in satisfaction and discharge of their Claims, the terms of which are described in further detain in the Plan.

The following discussion does not necessarily apply to holders who have Claims in more than one class relating to the same underlying obligation (such as where the underlying obligation serves as the basis for a primary Claim against one Debtor and a secondary liability or guarantee claim against another Debtor). Such holders should consult their tax advisors regarding the effect of such dual status obligations on the federal income tax consequences of the Plan to them.

In general, if the Allowed General Unsecured Claim being exchanged for the Preferred Stock qualifies as a "security" for income tax purposes, the exchange will be treated as a recapitalization under Tax Code section 368(a)(1)(E) and the holder will generally not recognize either gain or loss on the exchange and the holder's tax basis in the Preferred Stock will equal the holder's basis in the old debt. The definition of a "security" for these purposes is not the same as for securities law or other purposes. Whether a Claim will be treated as "security" depends on a number of factors, the most important of which is the original term of the debt instrument. An instrument with a term of five years or more is often treated as a "security" while an instrument with a term of three years or less is normally not treated as a "security". Each holder is urged to consult its tax advisor whether it's Allowed General Unsecured Claim qualifies as a "security" for purposes of Tax Code section 368(a)(1)(E).

If the Allowed General Unsecured Claim is not a "security", then each holder of an Allowed General Unsecured Claim, should recognize gain or loss in an amount equal to the difference between (x) the fair market value of the Preferred Stock received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest). Pursuant to the Plan, distributions to any holder of an Allowed General Unsecured Claim, will be allocated first to the original principal amount of such Claim as determined for federal income tax purposes and then, to the extent the consideration exceeds such amount, to any portion of such Claim representing accrued original issue discount ("OID") or accrued but unpaid interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes. In general, to the extent that an amount received by a holder of debt is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder will generally recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full. Each holder is urged to consult its tax advisor regarding the allocation of consideration

47

and the deductibility of losses realized in respect of Allowed General Unsecured Claims for federal income tax purposes.

Where gain or loss is recognized by a holder of an Allowed General Unsecured Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was originally issued at a discount or a premium, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction in respect of that Claim. Generally, the holder's tax basis in the Preferred Stock will equal the holder's basis in the Claim plus or minus the amount of gain or loss recognized on the exchange.

B.      **Information Reporting and Withholding**

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, the following: (1) certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds; and (2) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

*THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS RECEIVING A DISTRIBUTION UNDER THE PLAN ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.*

## XI.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Class 1, Class 2, Class 3, and Class 4 entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than 4:00 p.m. (Eastern Time) on the Voting Deadline.

Dated: December 2, 2014

THE DEBTORS,

By:____/ s / David Fisher_____
David Fisher, CEO